Milo M. Pierce et al., Executors, Appellees, v. S. W. Jacobs et al., Appellants.

## Gen. No. 5357.

1. NEGOTIABLE INSTRUMENTS—*when note not merged in judgment.* If an administrator of a deceased endorser paid the amount due thereon to the last endorsee, as a result of the allowance of a claim in favor of such last endorsee, the note does not become merged in the judgment, but an action may be maintained thereon against the makers or judgment taken by confession (the note containing an authorizing power).

2. EVIDENCE—*when witness disqualified by interest.* Parties in interest are incompetent where the adverse party defends in a representative capacity.

3. EVIDENCE—*what does not waive objection to incompetent testimony.* If incompetent evidence is admitted, either over objection or subject to objection, opposing counsel may cross-examine without waiving the question of the competency of such testimony.

4. EVIDENCE—*presumption as to rejection of incompetent.* In a trial before the court without a jury it will be presumed that the court considered only such evidence admitted subject to objection as was competent.

Judgment by confession. Appeal from the Circuit Court of Kane county; the Hon. DUANE J. CARNES, Judge, presiding. Heard in this court at the April term, 1910. Affirmed. Opinion filed October 18, 1910.

S. N. HOOVER and JOHN A. RUSSELL, for appellants.

HOPKINS, PEFFERS & HOPKINS and JOHN T. RICHARDS, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

A corporation, named the Western Insurance Company of Aurora, Illinois, reorganized and changed its name to Western Fire, Marine and Plate Glass Insurance Company of Chicago, Illinois, and in July, 1901, had a board of directors composed of S. W. Jacobs, S. M. Farwell, Matt. W. Pinkerton, W. K. Twomey and Edward Pierce, of which board Pierce was president and Twomey was secretary and treasurer. At a semi-annual meeting of the board of directors, held on July 8, 1901, the records of the board show the following action taken:

"Owing to the fact that a good many old bills had accumulated under the management of the former secretary, and his collections not being in shape, it was decided that the corporation should raise the sum of twenty-five hundred dollars ($2,500) to clear up all indebtedness. The following resolution was offered and adopted:

That directors Matt W. Pinkerton, S. M. Farwell, S. W. Jacobs and W. K. Twomey draw a note for the sum of twenty-five hundred ($2,500) dollars in favor of the president, Edward Pierce, payable in ninety days from date at the rate of six per cent. (6%) interest, and set aside as a guaranty of the payment thereof two certain notes under date of December 10, 1900, being for twenty-five hundred ($2,500) dollars each, one due on or before three (3) years, the other on or before four (4) years, drawn by Isaiah H. Bradford, in favor of Ann E. Pinkerton and by her endorsed; the same being secured by mortgage on certain mineral lands located in St. Louis County, Minnesota, and said note was drawn in accordance with said resolution."

A judgment note was thereupon drawn for $2,500 payable to the order of Edward Pierce in 90 days, with interest at the rate of 6% per annum, and it was signed by Jacobs, Farwell and Twomey, and at some later date was signed by Pinkerton, who was not present at that meeting. As collateral to this note two notes for $2,500 each, drawn by Bradford in favor of Ann E. Pinkerton and by her endorsed, and a mortgage securing the same and two other like notes on land in Minnesota, were delivered to Pierce. On July 15, 1901, after Pinkerton had signed the note, Pierce endorsed and guaranteed the payment of the note on the back thereof, and the Merchants' National Bank of Aurora, Illinois, discounted the note and delivered to Pierce a draft for $2,500 which Pierce endorsed to the order of W. K. Twomey, treasurer, and Twomey received the draft and the proceeds thereof were used to pay debts of said Western Fire, Marine and Plate Glass Insurance Company. Pierce died on November 9, 1901, and letters testamentary were issued to his executors by the Probate Court. The Bank filed a claim against the estate of Pierce upon said note and guaranty, and said claim was allowed and paid by the executors. The executors then entered a judgment by confession upon said note against the makers thereof in the circuit court. The defendants obtained an order opening the judgment, preserving the lien, staying the execution and permitting defendants to plead. Afterwards they withdrew certain pleas previously filed and filed an amended special plea. The court sustained a demurrer thereto and defendants failed to plead further, and the order opening the judgment, etc., was vacated. This court reversed that order in Jacobs v. Pierce, 132 Ill. App. 547, and the cause was remanded. Thereafter the common counts and certain pleas and replications were filed, issues were joined, a jury was waived, the cause was tried, the issues were found for appellees and the order opening the judgment was again vacated. Three defendants appealed and all the defendants have assigned error as appellants. Appellants mainly rely on three contentions: 1. Appellants contend that the note was merged in the judgment in the probate court and that no

judgment by confession could thereafter be entered upon it nor could any suit be thereafter maintained upon the note. 2. Appellants contend that after the note was given Pierce bought fifty shares of stock of the corporation, of the par value of $5,000, and agreed to turn in this note as part payment therefor, and receive a certificate for the shares of stock; and that Pierce thereby became bound to take up and surrender this note to the corporation, which was the sole beneficiary of the note; and therefore, neither he nor his executors can maintain a suit upon said note against appellants. 3. Appellants contend that Pierce held the collaterals as security, not only for himself but also for appellants; that said collaterals were worth much more than is due upon this note; that Pierce allowed the collaterals to go out of his hands; and that thereby the liability of appellants to him and to his estate on said note was extinguished.

1. When this case was first before us in 132 Ill. App. 547, we held that Pierce's executors, having taken up the note, had a right to erase the endorsement and maintain an action upon it against these appellants, and cited authorities therefor, including Campbell v. Humphries, 2 Scam. 478, where it was held that "if the payee or any assignor has been under the necessity of taking up the note his right of action revives." In 15 Am. & Eng. Encyc. of Law, 1st Ed., 342, the same rule is thus stated: "While a judgment recovered upon a promissory note or bill of exchange is a merger of the cause of action as between the parties to the suit, the note or bill is not so merged as to prevent the endorsers from paying the judgment, receiving the note and maintaining an action on it against the maker." In 1 Freeman on Judgments, 4th Ed., sections 227 and 227a, the same doctrine is stated, and it is shown that in such a case the note is not merged in the judgment against an endorser, but the judgment and its payment have no other effect as to the maker than does payment by the endorser without the judgment, and the endorser upon taking up the note may maintain an action thereon. In this case the liability of Pierce to the Bank was not upon the note itself, but upon his contract of endorsement and guaran-

ty written upon the back of the note. While the claim filed and introduced in evidence appears to have the original note attached thereto, there is proof it was the copy that was filed and not the original, and that when the executors paid the claim they obtained the note at the bank. But whether the note itself was filed in the probate court or not, we are of opinion that its allowance and payment had no other effect as between the makers and the payee and his estate than would the payment of the note by the executors have without its allowance. So far as the makers are concerned, the simple fact is that the executors of the payee paid the endorsee the amount of the note and took it up and then had a right of action against the makers.

2. Appellants' second contention is that after this note was given Pierce purchased fifty shares of the stock of the corporation and received the certificate therefor and agreed to surrender this note to the corporation as part payment for said shares of stock, and it is claimed that the only reason why he failed to surrender the note was because he was soon after taken fatally ill and died. On this and some other matters appellants testified. Appellees objected to the testimony on the ground that they were incompetent witnesses. In some instances the court overruled the objection and appellees excepted. In other instances the court indicated his opinion that they were not competent, but permitted the evidence to go into the record subject to objection. It is obvious that under section 2 of the Act in relation to Evidence and Depositions, the defendants are not competent witnesses in their own behalf as to any matter occurring during the life of Edward Pierce. It is argued that some of these facts were brought out by appellees' counsel on cross-examination. Upon examination of the record, which is not fully abstracted in this respect, we conclude that this was a proper cross-examination upon matters brought out by appellants' examination in chief, which the court either permitted to be heard subject to objection or overruled the objection thereto. If incompetent testimony is admitted either over objection or subject to objection, we are of opinion that opposing coun-

sel may cross examine without waiving the objection. We are therefore of opinion that the testimony of appellants ought not to be considered where it was so objected to. The competent testimony having a tendency to prove that Pierce purchased fifty shares of stock of the corporation and agreed to surrender this note in part payment therefor, consists chiefly of the testimony of P. F. McGivern, who was a bookkeeper for the corporation, and of Mrs. Clara McGrew, who was stenographer for appellant, Jacobs, in the office of the corporation, and of J. J. Luck. McGivern testified that some days after this note was given, he heard a conversation between Pierce and Twomey and some one else, in which Pierce either said that he would take fifty more shares of stock or that he would not at that time take more than fifty shares of stock, and that afterwards, at the request of some one, he asked Pierce when he expected to return the note for $2,500 and Pierce replied that he intended to bring it in for cancellation in a few days. Mrs. McGrew testified that after the directors' meeting of July 8, 1901, Pierce came into the office and told Jacobs that he received the fifty shares of stock which he had agreed to take and that he would send in the note to be cancelled and pay for the balance of the stock; that he was tied up in a real estate deal and when that came easier he would send in the money. She testified that she knew that this meant the $2,500 note signed on July 8, because she knew about that note from the minutes of the directors' meeting which she wrote up, but she admitted that she did not hear Pierce say that it was the note of July 8. Luck testified that he was a partner of Pierce in another matter, and that in a conversation Pierce told him that this company needed some money and that he had to take some stock and pay a note and was hard up, and that he took $5,000 more stock in this company for a $2,500 note; that he had taken some stock in place of money he expected on a note. If these conversations related to the $2,500 note here sued on, then they tend to show that Pierce had agreed to take fifty more shares of stock and deliver said note to the company in part payment therefor. But there are many facts and

circumstances in evidence to make it doubtful whether, if those conversations occurred, they referred to this note. The proof shows that there had been two other notes of $2,500 each on which Pierce had been liable, connected with the affairs of this corporation. On January 4, 1901, before the re-organization and change of name had been effected, Jacobs and one W. A. Lowell, who was a director of the corporation, gave Pierce a paper signed by them, in which they said, "If we secure control of the charter we hereby bind ourselves to make you good, so far as the two notes of $2,500 each, and any money you may advance at this time out of the business of said company, and after the completion of the new organization will hand you a legal paper covering this ground." The proof shows that when the re-organization was effected Jacobs and Lowell owned far more than a majority of the capital stock, and they therefore secured the control referred to in said paper. There is no competent evidence that the $2,500 note which Pierce was to surrender in part payment of fifty shares of stock (if he did agree to surrender a note for that amount), was not one of the $2,500 notes referred to in the paper of January 4, 1901. Again, according to the record evidence, Pierce did not buy fifty shares of stock after the note in suit was given. The corporation had a bound stock book which contained blank certificates of stock and a blank stub. When a certificate was issued the stub was filled out and remained in the book after the certificate was detached. The last certificate ever issued by this company appears to have been on stub No. 222 and according to the stub it was dated and issued to S. W. Jacobs on July 5, 1901. The certificates numbered from 223 to 604 and the accompanying stubs all remained blank in the certificate book at the time of the trial. Under date of June 22, 1901, certificate No. 220 for fifty shares was executed to Edward Pierce and the stub states that it was issued to Edward Pierce on June 22, 1901. Appellants called for the certificate itself and obtained it from appellees and offered it in evidence. It was not only dated June 22, 1901, but the revenue stamp upon it, which the law then required, was marked canceled June 24,

1901. This is strong evidence that the certificate was prepared and executed on June 22, and that the stamp was cancelled on June 24, 1901. If so, then the testimony introduced by appellants to the effect that ten days or two weeks after this note was given on July 8, Pierce agreed to take these fifty shares of stock and deliver this note in part payment cannot be true. McGivern testified that this stock certificate was issued some time after July 8, and that by arrangement it was dated back some time in June. He did not, however, prepare this stock certificate nor see it issued, nor have anything to do with the issue of stock certificates, but only testified in reliance on an alleged conversation in which it was proposed to date it back. No explanation was given of the fact that following the stub of this certificate to Pierce in the stock book were two certificates dated July 5, 1901, except the statement by a witness of a possible explanation which he did not know to be true. There is other evidence in the record tending to show that the claim that Pierce, a week or ten days after the execution of this note on July 8, agreed to take fifty shares of stock and to turn in this note to the corporation in part payment therefor is an afterthought. The note came due about October 6, 1901. On October 11, Jacobs wrote Pierce that "we" expected to be out to Aurora before this, but that Twomey had been East on business for the corporation and had not yet returned and was expected back Monday or Tuesday and "just as soon as he returns will take care of as much of the note in the bank as possible and pay the interest for another ninety days:" that the writer did not know "how much we can pay when he returns, but we will do the best we can under the circumstances." On October 17 or 18, 1901, Farwell and Twomey visited the bank, asked for and obtained an extension of sixty days and paid the interest from October 6 to December 6. This was testified to by N. C. Simmons, the president of the Bank. Appellants sought to prove by Simmons by cross-examination that Farwell or Twomey then told him that there was an arrangement by which Pierce was to pay the note, and secured from him once an answer that he

would not testify that such a statement was not made.   A reading of his entire examination, however, from the record itself, will show that he frequently denied any recollection of any such statement, and that he gave it as his belief that no such statement was then made to him.   On December 12, Twomey came again to the bank and paid the interest from December 6, 1901, to February 6, 1902.   Under date of February 4, 1902, Jacobs wrote the bank in part as follows: "The signers of the note of $2,500 which you hold signed by Matt W. Pinkerton, S. M. Farwell, W. K. Twomey and S. W. Jacobs and endorsed by Edward Pierce, which will fall due, we understand, the 6th of February, would like to have it extended ninety days upon payment of the interest." He also told them that Twomey held the collateral in trust for the holder of the note and was willing to turn it over to the bank on receiving an agreement to produce it in court in Cook county if required.   The evidence indicates the entire solvency of Pierce and his estate.   The letters are better evidence than the recollection of witnesses.   If a week or ten days after July 8, 1901, Pierce had subscribed for and obtained fifty more shares of stock in the corporation and had agreed to pay this note at the bank and surrender it to the corporation, and had received a certificate for such fifty shares of stock, it is not reasonable that this officer of the corporation and maker of the note should have been writing such letters, one to Pierce in his lifetime, recognizing the duty of the makers to pay the note, and the other asking its extension and offering to turn over the collateral to the bank; nor that Farwell and Twomey should have been paying the interest and securing extensions.   Moreover, Pierce died and these makers were officers of the corporation and all but one of its board of directors, and if Pierce had not paid for this stock it would have been natural for them to have a claim filed against his estate in the name of the corporation for the amount which Pierce owed the corporation for the fifty shares of stock.   This was not done.   They knew they were liable to the bank for this note and they took no steps to cause the estate of Pierce to pay it so as to relieve themselves from

liability as they would have been likely to do if Pierce had promised afterwards to pay the note and surrender it to the corporation. In view of these and other facts appearing in evidence, we cannot say that the trial court ought to have found that after this note was given Pierce bought fifty shares of the capital stock of the corporation and agreed to take up and surrender this note as part payment therefor.

3. The collateral described in the resolution of the company above set out consisted in two notes of $2,500 each, secured by the mortgage with two other notes of $2,500 and the proof is clear that the mortgaged premises were worth very much more than $10,000, so that this note was amply secured by the collaterals. One special plea averred that before the maturity of the note here sued on, Pierce delivered said collaterals to Ann E. Pinkerton, whereby said collaterals became lost as security for said note, in violation of the agreement of said Pierce to hold said collaterals till the note here sued on was fully paid. The special replication denied these allegations. The resolution above set out provided that said collateral notes and mortgage should be set aside as a guaranty of the payment of the note in suit, but it did not state who should hold said collaterals. The evidence seems to show that they were first placed in the hands of Pierce, the payee, but it clearly appears that forthwith they were in the hands of Twomey, one of the makers of the note, and that they remained there till long after the death of Pierce. In a certain chancery proceeding afterwards pending in the superior court of Cook county, Pinkerton and Twomey, two of the defendants thereto, filed on April 23, 1902, a sworn answer, wherein, in reference to the matters now under discussion, they made the following allegations under oath:

"These respondents further answering show that previous to the filing of the bill herein and on the 8th day of July 1901 the sum of $2,500 was borrowed by the directors of said complainant corporation and turned into the treasury of said complainant for the use thereof. That said last named sum of money was borrowed upon a note made by said directors as individuals to the order of Edward Pierce, president

of said complainant corporation, and by said Pierce endorsed and negotiated for said money. And thereupon the said several notes in said partition shown as in the possession of said respondent, Twomey, were by said complainant corporation transferred to said Pierce and by said Pierce transferred to said W. K. Twomey to have and hold as security and indemnity for the payment of said sum of $2,500 to the legal holder of the note therefor and to the makers and endorsers thereof. And said note for $2,500 is still outstanding and unpaid and held by a certain Banking Company located at Aurora, Illinois, for value, and said Twomey now and at all times since the day last aforesaid has and still holds the said several promissory notes for the use and benefit of the said pledges under said deposit contract and upon no other right or claim whatever."

There was oral proof tending to show that Twomey and Farwell also offered the collateral to the bank. Jacobs, in his letter of February 4, 1902, to the bank, said that Twomey held the collateral in trust for the holder of the note and offered to turn it over to the bank on certain conditions. Bradford, the maker of the collaterals, testified that he paid them personally to Ann E. Pinkerton on August 3, 1907, but the cross-examination shows that in fact he received the collateral notes and mortgage from Matt W. Pinkerton, one of the appellants herein. It is clear that, during substantially all of the time from the date of this note till long after the death of Pierce, Twomey held this collateral for the benefit of all parties to this note. How he came to place them in the hands of Matt W. Pinkerton does not appear. Pinkerton also was secured for his liability on this note by said collateral, and his answer above mentioned shows that Twomey held it in trust for his benefit with his approval. The proof therefore shows that Twomey held the collateral in trust with the approval of Farwell, Jacobs and Pinkerton; and we think it must be assumed that whatever disposition was made of the sum paid by Bradford in discharge of the collaterals was satisfactory to the appellants. The appellants were competent witnesses as to all that occurred after the death of Pierce. They could have proved when and how and under

what arrangement the collaterals passed from the possession of Twomey to that of Pinkerton, and what was done with the proceeds thereof when collected.   Pinkerton received them from Twomey with full knowledge that they were held in trust for the payment of this note, as shown by his sworn answer above quoted.   The allegations of the special plea that Pierce was the one who surrendered these collaterals to Ann E. Pinkerton is not only unsupported by any proof, but it is also completely disproved, and the trial court could not have found the plea sustained by the proof.   No doubt it is true that as between appellants and Pierce on the one hand and the Western Fire, Marine and Plate Glass Insurance Company on the other, all five of the original parties to this note were sureties for the corporation and all protected by this collateral, and it may well be that if the collateral had been lost without the fault of any one and the corporation was insolvent the loss should be divided among all five of the original parties, including Pierce, so that in such a case the appellants would be liable to Pierce for only four-fifths of the loss. But not only is there no plea setting up such a defense by the four makers, but also it is clear that the four appellants were acting together, that Twomey had the collaterals for them, that he in some way placed them in the hands of Matt W. Pinkerton who knew they were held in trust as such security and who therefore took them as trustee, and that he surrendered them when they were paid.   It must be presumed that he was acting for the appellants and that they have had the full benefit of the collaterals in some way satisfactory to them, and which they did not see fit to divulge.   We are of opinion that the judgment does substantial justice.

The court kept out no competent testimony offered by appellants.   Under a familiar rule it will be presumed that the court considered only such of the evidence admitted subject to objection as was competent.   The ruling of the court upon propositions of law presented by appellants was in harmony with the views herein expressed and does not require discussion.   We find no reversible error in the record and the judgment is therefore affirmed.

*Affirmed.*